[Criminal No. 558.   Filed January 23, 1923.]

[211 Pac. 859.]

In the Matter of the Application of FRANK LA GRANGE for a Writ of Habeas Corpus. FRANK LA GRANGE, Appellant, v. STATE, Respondent.

HABEAS CORPUS — EVIDENCE OF CONNECTION WITH MURDER HELD TO WARRANT DENIAL OF DISCHARGE FROM CUSTODY.—Evidence of connection between one held in custody and a murder committed on land formerly owned by him *held* sufficient under Penal Code of 1913, section 1359, to warrant refusal to discharge.

APPEAL from an order of the Superior Court of the County of Yavapai. J. J. Sweeney, Judge. Affirmed.

Mr. Jos. C. Furst, for Appellant.

Mr. W. J. Galbraith, Attorney General, and Mr. John L. Sullivan, County Attorney, for the State.

McALISTER, C. J.—This is an appeal from an order of the superior court of Yavapai county refusing to discharge from custody appellant, Frank

La Grange, after a hearing in a *habeas corpus* proceeding. A preliminary hearing before a magistrate resulted in an order holding him to answer to the superior court, and fixing his bail at $7,500, but, being unable to furnish this, he was placed in the county jail. The petition alleges that his imprisonment is illegal, and wholly without warrant or authority of law, in that he was committed without reasonable or probable cause. Attached to his petition was a full, true and correct transcript of the evidence taken at the hearing, which consisted of the testimony of Clint McLaren, L. F. Wilson, Clark Elmer, William G. Doyle, Ira Tyler, J. C. Furst, Bert Roland, and Lillian Axton.

It appears from this that early on the evening of December 26, 1920, just after supper, Walter Steinbrook started on horseback from the house of Bert Roland at Hooper, Yavapai county, where he was then living, for Prescott, for the purpose of having some ore assayed, and that he went by the home of appellant, who lived about three miles from Roland's, and stopped to see him. No other person saw Steinbrook alive after that. The next day, or the second day afterwards, the 27th or the 28th, appellant appeared at the home of Clint McLaren, which was twelve or fifteen miles from where he lived, with Steinbrook's horse, saddle and chaps, and, according to McLaren's testimony, told him that Steinbrook came by his (appellant's) place the night before on his way to town and wanted appellant to take the horse, saddle and chaps up to McLaren's and leave them with him. When asked by McLaren how Walter would get out of there, appellant said he had asked him that question himself, and Walter told him he had a way of getting out. McLaren thought it funny Walter did not come along himself. Appellant offered while there to sell McLaren his place, con-

sisting of three mining claims, on which were some small buildings, and some land in orchard for $150, and appeared to be in a bit of a hurry to dispose of it, even at a sacrifice, stating that his wife was not well, and he wanted to get to the coast. Within a day or two thereafter McLaren showed the place to one Elmer Clark, who purchased it January 1, 1921, for this sum, though appellant reserved a mining claim up on the hill upon which was a shaft, saying it had a windlass on it, and some tools, and he might want to come back and work it, or might send him the money to do it for him if he could not come himself. He told Elmer he had some pretty good gold ore over there, but that it "didn't go down; that he started to fill the shaft up and was going to drift on it to find where it did go down." McLaren and the witness Wilson thought the place worth $700 or $800, though Elmer said its value was not over $150. While there with Elmer on New Year's Eve, or the day before, McLaren noticed a fire about 100 feet up the creek, near the little barn. It was smoking a little, and "smelled kind of peculiar." There were ashes three or four feet in circumference, and appellant said he was burning a little malt he had lying around before leaving. Steinbrook had told McLaren some time before this that he was going on a trip to Mexico or South America, because he had not had much luck around there, and that when he left his horse would be McLaren's.

Tom Roach, who lived with Roland and Steinbrook, had ridden the latter's horse on the 26th, and when he arrived home late in the afternoon Steinbrook told him not to unsaddle, because he was going to town. Steinbrook had a black purse, which may have had some notes and bills in it, as he had, according to the testimony of Wilson, several thousand dollars, and was in the habit of carrying considerable

money with him, though it is not clear whether it contained any at this time. He wore glasses sometimes. It was cold that night, and he said as he was leaving if it got too cold he would stop on Turkey Creek somewhere. A few days before this appellant asked Steinbrook to come over, stating he had a package for him which he had brought out from town. He had lived at appellant's place eight months during that year, 1920.

The latter part of February or early in March, William Doyle and Irving Barron, while prospecting, came upon an abandoned shaft on Raster Creek, in the Turkey Creek country. Barron jumped down in the shaft. Someone had shoveled dirt in it, and upon this lay a shovel, a pick, and some handsteel, and according to Doyle's testimony a windlass was down in it. There was a peculiar odor in and around the shaft, like that of a dead animal of some kind, and many flies. It was late, and they left, going by McKittrick's, only a few miles away, and told him about it, to which he replied that no one was missing. They then suggested that probably someone was killing his cattle, and he said, "That might be." After describing the shaft to him, he said it was on La Grange's place. They never went back.

On the 25th of June, 1921, L. F. Wilson, a nephew of Walter Steinbrook, accompanied by another party, and guided by a description given him by McKittrick, went on horseback from the town of Mayer to the shaft near the place appellant sold Clark Elmer. They found it about half full of dirt, lying upon which were a windlass, bucket, standards, some steel, pick and shovel, and a single jack. Before throwing out any dirt they went over to the old La Grange ranch, and had Clark Elmer, Louie Dondrio, and Clint McLaren go back with them to aid in cleaning it out. In doing this a human skull was brought up

in the shovel from the bottom of the shaft, and as soon as it was discovered they ceased work until the coroner's jury came out the next day, when the torso of a human body, in two sacks, one drawn up from the bottom, and another one from the head down, tied around the neck with a small-sized cotton rope, was taken from the shaft. The body was then removed to town, when it was learned that it was not all there—that the arms, the legs, and three ribs were gone. A few days later Wilson went back to search for the remainder of the body, and described what he found in this language:

"I looked for a certain shaft that Mr. McKittrick had described—that he said Frank La Grange had sunk—and we looked for it for two or three days, but we couldn't find the shaft, and, I think, about the third day, we went down to Clark Elmer's place to get a drink of water, and I went over into the orchard to look around, and, upon examining the ashes around the little trees that were there, I found a human tooth, and I started in then and went around to each and every tree that was in the orchard, and I found human bones and buttons and amalgam that was—that looked like it belonged in filling out of teeth; Mr. Elmer's boy was there, and he found a hole right opposite the house where there was all kinds of ashes and bones and buttons and cloth—the evidence of human clothes being burned there. I sifted that all out, and found several more teeth. Then, on examining the hillside alongside of the orchard, I would find larger bones, large pieces of charcoal, and buckles off of overshoes, what would seem as if whoever scattered these bones had them in a can or something and was putting them around these trees, and whenever they run across a bone or something that was too large he would throw it upon the hillside in this brush that had been cleared off. Found a penknife and a pair of rims for eyeglasses. My uncle would weigh about 155 or 160 pounds. He was practically bald on top—that is, right on top of his head. The skull I dug up just had hair around

the sides, and just practically—just a little bit on top. The skull had a bullet hole in the base of the head. The part in front and his lower jaws were all gone. Comparing the hair on the skull that was found with the hair of my uncle, I would say from the cause of moisture, at the time I looked at it, it was just a little bit darker than my uncle's, but otherwise it was the right color. There was a small portion of the upper jaw bone left, and it had three or four teeth in it. Of the torso, both arms and both legs were gone, and three ribs were gone."

Ira Tyler, a boy sixteen years of age, testified that he borrowed a knife from Steinbrook, keeping it about a month, and when shown the knife found at the Elmer place by Wilson identified it as the one loaned him by Steinbrook. He was able to do this, notwithstanding it had since rusted and lost its handle, by its appearance and size, and by the fact that it had four blades, one of which had been broken; that is, a nick corresponding to the one in the knife shown him had been broken out of it near the end.

Appellant and his wife went to California about the 1st of January, 1921, and some time after they had gone Mrs. Lillian Axton, a friend of theirs, wrote Mrs. La Grange that the authorities wanted her husband for murder. She did not hear from them, however, until October, 1922, when a letter written by Mrs. La Grange, but signed Mrs. F. A. Anderson, and dated Ray, Arizona, was received. She addressed her reply to Mrs. F. A. Anderson.

There can be no question but that the person whose body was removed from the shaft was murdered, but, inasmuch as the witnesses were unable to state positively that it was the body of Walter Steinbrook, or that Walter Steinbrook is dead, appellant contends that his imprisonment is illegal, and without warrant or authority of law, in that he has been committed and is held without its having been reason-

ably or probably shown that Walter Steinbrook was dead, and, if dead, that appellant took his life. It is true the witnesses could not identify positively this body as that of Steinbrook, though one of them, L. F. Wilson, was positive in his own mind that it was, yet the circumstances pointing that way are so strong that this court cannot say that there is not reasonable or probable cause to believe that it was; and the same is true of those pointing to appellant as the one who committed the murder and concealed the body. The facts speak for themselves, and it is unnecessary to consider them further than merely to relate them. They amply justify the order holding him to answer, and, while this order is sometimes properly made when a conviction upon the same proof would not stand, yet the evidence here bearing upon the murder, the identity of the body removed from the shaft near appellant's former home, and his connection with the crime is such that it cannot be said that he has been committed without reasonable or probable cause, as this term is used in paragraph 1359, Revised Statutes of 1913, Penal Code.

The judgment of the lower court refusing to discharge appellant is affirmed.

ROSS and LYMAN, JJ., concur.